Filed 10/16/14  Marriage of Hogan CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re the Marriage of ARACELI G. and BRENT M. HOGAN. | B248740 |
| | (Los Angeles County Super. Ct. No. BD423978) |
| PAUL LING et al., Appellants, v. DAVID J. PASTERNAK, Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, Thomas T. Lewis, Judge.  Affirmed.

Altshuler & Spiro and Bruce J. Altshuler for Appellants.

Akin Gump Strauss Hauer & Feld, Rex S. Heinke and Jessica M. Weisel for Respondent.

_____

Paul Ling and Edythe Ling (the Lings) appeal from the order awarding fees to receiver David J. Pasternak (Pasternak). The Lings co-owned three apartment buildings with Araceli and Brent Hogan (the Hogans), and during the Hogans' acrimonious dissolution proceedings, Pasternak was appointed receiver of the apartment buildings. The Lings contest the trial court's refusal to surcharge Pasternak and its award of Pasternak's fees. We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### 1. *Commencement of Receivership*

The Hogans commenced proceedings to dissolve their marriage in April 2005. The Lings and the Hogans owned, as tenants in common, apartment buildings located in Los Angeles at 954 Ardmore Avenue, 1249 West Sixth Street, and 534 Heliotrope.[1]

On February 10, 2009, Araceli Hogan petitioned for joinder of the Lings in the dissolution proceedings in order to partition the three properties and to obtain an accounting of the income received on the three properties since January 2006.

On December 30, 2009, during the Hogan's dissolution proceedings, Pasternak was appointed receiver to take immediate possession and control of the three apartment buildings. The order appointing Pasternak provided that Pasternak and his office personnel were to be paid "their usual hourly billable rates," and "[a]ny and all expense of the operation of the receivership estate [were] the risk of the receivership, and not the personal obligation of [Pasternak]." The receivership order was approved as to form and content by the Hogans and the Lings.

On April 5, 2010, pursuant to court order, Pasternak listed the three properties for sale.

1. The Sixth Street property was listed for $2.15. million. Due to problems with the condition of the property, Pasternak was unable to sell the Sixth Street property after an escrow fell through. The Lings later purchased Araceli Hogan's interest in the property.

---

[1] Neither of the Hogans are a party to this appeal.

2. The Heliotrope property was listed for $1.395 million. On July 13, 2010, the court authorized Pasternak to sell the Heliotrope property for $1.175 million. Pasternak received sales proceeds of $237,553.61 from the sale of the Heliotrope property.

3. The Ardmore property was listed for $1.250 million. On October 14, 2010, the court authorized Pasternak to sell the Ardmore property for $1.035 million. Pasternak's proceeds from the sale were $302,356.10. As discussed below, the sale of this property involved the payment of a $7,920 "breakup fee" for the buyer's due diligence because the buyer was outbid.

Pasternak's first 10 monthly interim reports were not challenged by any party. However, with the November 2010 report, the Lings began challenging Pasternak's interim reports.

As a result of disputes over Pasternak's handling of the estate, on April 27, 2011, the parties entered into a stipulation to replace Pasternak with Kevin Singer.

On June 29, 2011, Pasternak filed his final report and account (FRA), seeking total fees and costs of $216,267.62, of which $152,755.99 has been paid, with $63,511.63 due and owing. After the Lings objected to the FRA, seeking to surcharge Pasternak, evidentiary hearings were held on the FRA.[2]

2. *Trial*

The Lings sought to surcharge Pasternak for a property tax penalty, what they claimed were excessive insurance premiums, overbilling, the breakup fee on the Ardmore property, and unauthorized and unsatisfactory repair work by a contractor on the Sixth Street property. They also contended Pasternak was not entitled to fees for services rendered after his resignation.

A. Property Taxes

The Lings claimed receiver paid the property taxes late in April 2010, although the balance on hand as of March 31, 2010 was sufficient to pay them. Pasternak's office advised

---

[2] The record does not contain a complete transcript of the hearings, but commences midway through one witness's direct testimony.

3

the parties on April 10, 2010 that the property taxes would not be paid by the April 12, 2010 deadline because Pasternak needed to keep funds on reserve for essential repairs. Pasternak noted the penalties would amount to approximately $3,000 and at least one of the properties would sell enabling Pasternak to pay the taxes and penalty at that time.

> B.    Insurance

The Lings claimed Pasternak chose a new policy on one of the properties without checking prices, coverage, or obtaining competitive quotes. Pasternak countered that the policy was cancelled and he had to seek new insurance on short notice.

> C.    The Breakup Fee, Sale of Ardmore

Pasternak promised to pay the buyer of the Ardmore property's due diligence and inspection expenses if the buyer were outbid at the sale, known as a "breakup" fee. At the October 14, 2010 hearing on the sale of the property Pasternak told Mr. Ling—in response to Mr. Ling's question about the nature of the breakup fee—that the fee "will come out of my share. You will not pay the break-up fees. I will pay it." The Lings asserted this statement was Pasternak's promise to pay the breakup fee out of his own funds, while Pasternak asserted that he misunderstood Mr. Ling's question and that "[i]n explaining that the breakup fee would 'come out of my share,' I was referencing the receivership and not my personal fees."

> D.    Hourly Fees

The Lings claimed that Janet Kaiser's hourly fee of $225 per hour was excessive, as were the fees of the bookkeepers ($175 per hour) and clerk ($50 to $175 per hour), and receiver's assistant ($175 per hour), while an average bookkeeper, Inna Natan, charged from $55 to $75 per hour. The Lings also objected to Pasternak's fees as excessive (from $495 to $550 per hour). Further, The Lings claimed Pasternak chose a Long Beach firm to manage three mid-Wilshire properties but had one of his staff (Ms. Kaiser) perform the function of a manager at $225 per hour (as opposed to the five percent gross rent of the property manager).

> E.    Repairs to Sixth Street Property

The Lings objected that Pasternak did not advise the parties of the repair work; did not seek approval or direction from the court; did not seek advice of a structural engineer for

the foundation problems; the contractors did not obtain permits; Pasternak did not seek a second or even a first expert opinion; Pasternak did not obtain plans or drawings for the proposed work; Pasternak did not monitor the contractor's work; and secretly paid the contractor over $106,000 for unauthorized work, claiming it was an emergency.

The Sixth Street property was more than 100 years old and in deplorable condition, having structural and foundational problems, inadequate plumbing, mold, and vermin. Repair work included drywall, repiping, flooring, stair repair, shoring, soil and structural engineering, beams, posts, footings, stucco and siding. Paul Ling testified that he did not inspect the Sixth Street property before he bought it. Ling did not know anything about the conditions at the property, such as pests, vermin, and plumbing problems.

Pasternak located a buyer for Sixth Street in December 2010 or January 2011, but the buyer became concerned about the condition of the property and terminated the contract. Araceli Hogan, however, was desperate to conclude the sale because she needed $200,000 from the sale in order to complete a transaction with Brent Hogan. The Lings offered $1.55 million for the property, but Pasternak needed to realize $1.6 million on the sale.

Pasternak engaged the services of Bradley Boric, a licensed contractor with whom Pasternak had worked before, to remedy the property's problems, but Pasternak did not enter into a contract with him. At trial on Pasternak's FRA, the court observed, "This isn't like you, Mr. Pasternak, not to have a signed contract." Pasternak explained that the extent of work needed to be done at Sixth Street was not apparent at first. In all other instances where Pasternak had used Boric, he had obtained competitive bids, yet Boric's bid has always been the lowest, and his work has been performed within the contract price. Pasternak did not obtain competitive bids because the work increased gradually and Boric was familiar with the site.

Boric testified at trial[3] that he began work in November 2010 on the basement of Sixth Street but was required to stop in April 2011. According to Boric, the building had, among other things, galvanized pipes improperly connected to copper pipes, leaking

---

[3] The reporter's transcript does not contain all of Boric's direct testimony.

bathtubs, electrical problems, and vermin. To fix foundational problems in the basement, Boric was required to lift the first floor and load bearing walls seven inches in order to install new framing members. As a result of the raising of the building, plaster walls cracked, plumbing popped, and ceilings fell in. Boric repaired these items. Boric removed an earthquake anchor to replace the framing structure to which the anchor was attached. Boric admitted that apartment 102 had a hole in the floor, but the hole was necessary for the work being done. The door to unit 102 was kept closed.

The final scope of Boric's work was never determined due to Pasternak's replacement. Pasternak, at the time of his FRA, had paid Boric $106,660 and Boric was still owed approximately $28,000.

John Hosseinian, a structural engineer, testified for the Lings that he inspected the basement in approximately April or May 2011. He thought Boric's shoring work was improper and the basement was "messy" and the "number of foundations" "did not make sense" to him. The earthquake anchors had been improperly removed, and there was a hole in the first floor open to the basement which was dangerous. Hosseinian replaced the earthquake anchors, but did not do them all at once. According to Hosseinian, it was illegal to remove anchors and floor at same time.

The replacement receiver, Kevin Singer, inspected the basement at Sixth Street and did not see any problems with Boric's work.

### 3. *Statement of Decision*

On April 13, 2013, the trial court issued its statement of decision. The court granted in part and denied in part the request to surcharge Pasternak, and granted Pasternak's fees in full. By way of surcharging Pasternak, the court ordered Pasternak to hold the Lings, the Hogans, and the estate harmless in the event Boric sought payment of amounts beyond what Boric had already received from the estate.

With respect to the hourly fees of Pasternak's staff, the court found Janet Kaiser "function[ed] in roles more expansive than just support staff for a management company," and that she supervised property managers and onsite managers; several of Pasternak's other staff members were attorneys and other staff members performed receivership duties.

6

Pasternak raised his rates during his tenure, but those increased rates were not objected to until Pasternak's final account; further, the court found the rates commensurate with Pasternak's experience and expertise.

With respect to the property taxes, the court found that it was reasonable and prudent for the estate to forego paying such taxes until Pasternak had a better understanding of the needs of the estate. With respect to insurance, the time and expense to seek other bids would have wiped out any savings in premiums.

With respect to the breakup fee, the court found that Pasternak's testimony was credible that he had no expectation the breakup fee would be personally charged to him. "It is more credible that [Pasternak] would state that the breakup fee would be charged against the Seller's share, when he incorrectly thought that Ling was the buyer, not the actual co-owner of the property." The court found the breakup fee reasonable.

With respect to Boric's work, the court did not find his work to be substandard. Further, the court found Pasternak acted reasonably in hiring Boric because "the situation was . . . dynamic; there were inspections, the problem increased from water leaks . . . to repair of structural problems." Nonetheless, Pasternak should have entered into a written contract with Boric, but Ling failed to carry the burden of proof that Pasternak's management of the property caused the estate to incur unnecessary fees. The court noted that Hosseinian did not explain how removal of the earthquake anchors actually caused any damages to the property; even on inspection, there was no citation to the property due to their removal.

The court concluded that the stipulation for the resignation of Pasternak reserved jurisdiction to determine Pasternak's fees, and Pasternak was entitled to fees for defending his accounting.

## DISCUSSION

### I. Powers, Duties, and Compensation of Receivers

"The receiver has, under the control of the Court, power to bring and defend actions in his own name, as receiver; to take and keep possession of the property, to receive rents, collect debts, to compound for and compromise the same, to make transfers, and generally to

7

do such acts respecting the property as the Court may authorize." (Code Civ. Proc., § 568.)
"The receiver is an agent of the court and not of any party, and as such[] [¶] . . . [¶] [a]cts for the benefit of all who may have an interest in the receivership property; and [¶] holds assets for the court and not for [any party]. (Cal. Rules of Court, rule 3.1179(a); *Lesser & Son v. Seymour* (1950) 35 Cal.2d 494, 499.) The receiver is obligated to preserve and manage the property during the course of the receivership. (*Title Ins. & Trust Co. v. Calif. Etc. Co.* (1911) 159 Cal. 484, 492.)

Receivers are entitled to compensation for their services. Such fees are generally paid from the property of the receivership estate, although the court may also impose receivership costs on the parties to the proceedings depending upon the circumstances. (*City of Chula Vista v. Gutierrez* (2012) 207 Cal.App.4th 681, 685–686; *Stanton v. Pratt* (1941) 18 Cal.2d 599, 603 [receiver entitled to reasonable fees and expenses incurred as compensation for fulfilling receivership duties]; Cal. Rules of Court, rule 3.1184(d) [authorizing compensation for duties performed by receiver].) "The amount of fees awarded to a receiver is 'in the sound discretion of the trial court and in the absence of a clear showing of an abuse of discretion, a reviewing court is not justified in setting aside an order fixing fees.' [Citation.]" (*Melikian v. Aquila, Ltd.* (1998) 63 Cal.App.4th 1364, 1368.) A receiver, as any fiduciary, may be surcharged and his or her surety held liable for a failure to properly carry out the duties imposed by the order of appointment. (*Stewart v. State of California* (1969) 272 Cal.App.2d 345, 351.)

## II. Receiver's Fees

### A. Receiver and Staff Hourly Rates

Although they do not contest the amount of time Pasternak and his staff spent on this case, the Lings contend Pasternak and his staff's fees were excessive. They assert that receiver presented no evidence the rates for himself or his staff were "a normal rate" for such personnel. The Lings point primarily to Janet Kaiser ($225 per hour) and bookkeeper Ms. Roman ($175 per hour) and claim that they presented evidence that an average bookkeeper (Inna Natan) bills her bookkeeping services at $55 to $75 per hour.

8

First, the Lings did not contest the receivership order, which provided that Pasternak and his staff would be paid at their "usual hourly billable rates," nor do the Lings contest that the rates charged were not Pasternak's usual hourly rates. As Pasternak's usual hourly rates, the rates were within the scope of the receivership order. Second, the record contains no evidence concerning the rates of other receivers or that Pasternak's rates were unreasonable.[4] Crucial to our review is an adequate record. We presume the order appealed from is correct, and a party challenging must provide an adequate record to permit us to determine whether the trial court erred. (See, e.g., *Vo v. Las Virgenes Municipal Water Dist.* (2000) 79 Cal.App.4th 440, 447.) Where the record omits portions of the transcript, we cannot find error on such a silent record, and therefore will infer substantial evidence supports the trial court's conclusions. (*Haywood v. Superior Court* (2000) 77 Cal.App.4th 949, 955.)

Further, the court found that Pasternak and his staff performed specialized functions peculiar to receiverships and thus were entitled to a higher hourly fee, thereby rejecting the Lings' evidence that a lower hourly rate was proper. We find no error in the court's determination in this regard.

B.      *Receiver's Charge for Time Incurred After Discharge and in Defending His Fees; No Requirement of Cost Bill*

The Lings contend the court erred in awarding Pasternak fees and his staff's charges incurred in defending Pasternak's own FRA, including those charges incurred after his resignation, and the court erred in granting Pasternak's staff time after his removal. The Lings further argue that Pasternak was required to submit a memorandum of costs for all costs incurred after his resignation pursuant to Code of Civil Procedure section 1032. We disagree.

A receiver's final report and account and right to compensation are governed by the provisions of California Rules of court, rule 3.1184. If allowance of compensation for the receiver or the receiver's attorney is claimed in the receiver's final account and report, the final account and report must provide the details of such service for the trial court's review.

_____

[4] Apparently, this portion of the reporter's transcript was omitted.

9

(Rule 3.1184(d).) After approval of the receiver's report and accounting, the receiver is discharged. (*Coburn v. Ames* (1881) 57 Cal. 201, 202–203.) After discharge, a receiver has no further official duties and generally is not a proper party to any action. (*Jun v. Myers* (2001) 88 Cal.App.4th 117, 124.)

These principles establish the Lings' claims are without merit. Compensation and cost reimbursement to a receiver is not governed by Code of Civil Procedure section 1032, but by the provisions of rule 3.1184. Further, Pasternak was replaced before he was discharged. Thus, Pasternak was entitled to compensation for defending his final report and account before his discharge although he had been replaced and no longer had any duties.

## III.  Administration

### A.  *Costs to Repair Sixth Street*

The Lings contend the court erred in finding in favor of Pasternak on his handling of the repairs at Sixth Street and granting them the "useless remedy" of Pasternak's indemnity from the contractor's claims. We disagree.

The court was within its power to reject Hosseinian's testimony and credit the replacement receiver Singer and Boric's testimony regarding the repair work, and find that while Pasternak erred in failing to secure a contract with Mr. Boric, Pasternak's handling of the repairs at Sixth Street were not improper.

Further, we do not agree with the Lings that requiring Pasternak to indemnify Boric's claims was "useless." As the court could order the receivership expenses to be paid by any party, by ordering Pasternak to indemnify the estate, the court surcharged Pasternak for his handling of Boric's work. Although this remedy did not directly benefit Mr. Ling, it did benefit the receivership estate.

### B.  *Receiver's Representations Regarding Breakup Fee*

The Lings contend the court erred in "not holding [Pasternak] to his representations" that he would pay the breakup fee. We disagree. As noted, it is the general rule that the costs of administration a receivership are paid from the receivership estate. Pasternak here, in order to promote the sale of the Ardmore property, agreed to reimburse the potential buyer out-of-pocket costs. This agreement was within Pasternak's powers. Pasternak explained to

10

the court that when he answered Mr. Ling's question, when he referred to "me," he meant himself in his capacity as receiver and did not refer to himself in his individual capacity. The court did not err in accepting Pasternak's explanation.

## DISPOSITION

The order is affirmed. Respondent is to recover his costs on appeal.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


ROTHSCHILD, P. J.


MILLER, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.